COURT OF APPEALS OF VIRGINIA


Present:    Judges Frank, Humphreys and Haley
Argued at Salem, Virginia


CHRISTOPHER LEE GILES

                                                                OPINION BY
v.        Record No. 0455-07-3            JUDGE JAMES W. HALEY, JR.
                                                                APRIL 8, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF MARTINSVILLE
G. Carter Greer, Judge

        Jameson R. Whitney for appellant.

        Karen Misbach, Assistant Attorney General (Robert F. McDonnell,
        Attorney General, on brief), for appellee.


I.  INTRODUCTION

        Code § 18.2-89 states in part that "[i]f any person break and enter the dwelling house of

another in the nighttime with intent to commit a felony or larceny therein, he shall be guilty of

burglary."  The issue we consider here, one of first impression in Virginia, is the extent to which

a person must inhabit a house for it to constitute a "dwelling house" under the statute.  We

conclude that under the facts of this case, where the owner slept in the house about one weekend

per month and maintained the house ready for immediate occupancy, such habitation suffices to

constitute a dwelling.  We therefore affirm the circuit court.

II.  FACTS

        On the night of September 27, 2005, Christopher Lee Giles went with two other persons

to a house in Martinsville, Virginia.  Giles removed the screws from a screen door and broke the

glass out from another door with a rock.  He stuck his hand through the door frame where the

glass had been and unlocked the door, thereby gaining access to the house.  The following

evening, the trio returned and took two televisions, a VCR, blankets, towels, toilet paper, and food.

The owner of the house was Oscar Thornton, Jr., a resident of Baltimore, Maryland, who was retired. He inherited the house from his mother when she passed away on June 29, 2005. He last came to the house before the break-in on September 17, which was a Saturday, and stayed at the house for the weekend. This was more or less ten days before the burglary. Thornton testified he commonly stayed at the house on weekends when visiting. He came to the house two times between his mother's death on June 29 and the September 17 visit. Thornton kept the refrigerator and pantry stocked with food and maintained sleeping quarters there. The electricity and water remained turned on, and the house was furnished in three bedrooms, a living room, family room, and kitchen. While Thornton was away, he left the house in the care of his cousin, Brenda Kirby. She testified she went to the house about once every two weeks to "make sure everything was in place and in order." Neither Thornton nor Kirby gave Giles permission to enter the home. Thornton himself paid to have the doors damaged by the burglary repaired.

A grand jury indicted Giles for statutory burglary in violation of Code § 18.2-89. He received a bench trial on November 17, 2006, at the conclusion of which the court found him guilty. On January 25, 2007, the court sentenced Giles to twenty years incarceration, with thirteen years and eight months suspended. Giles now appeals.

III. ANALYSIS

On appeal, we review the evidence in the light most favorable to the Commonwealth. Cirios v. Commonwealth, 7 Va. App. 292, 295, 373 S.E.2d 164, 165 (1988). "This principle requires us to discard the evidence of the accused in conflict with that of the Commonwealth and to regard as true all the credible evidence favorable to the Commonwealth and all fair inferences

that may be drawn therefrom." Guda v. Commonwealth, 42 Va. App. 453, 455, 592 S.E.2d 748, 749 (2004).

However, issues of statutory construction present pure questions of law that receive *de novo* review before this Court. Harris v. Commonwealth, 274 Va. 409, 413, 650 S.E.2d 89, 91 (2007). In construing a statute, we first look to the words used by the General Assembly. Tucker v. Commonwealth, 268 Va. 490, 493, 604 S.E.2d 66, 68 (2004). "When the language of a statute is plain and unambiguous, courts are bound by the plain meaning of that language and may not assign the words a construction that amounts to holding that the General Assembly did not mean what it actually stated." Miles v. Commonwealth, 272 Va. 302, 307, 634 S.E.2d 330, 333 (2006).

Construction of a statute involves "reference to its subject matter, the object sought to be attained, and the legislative purpose in enacting it; the provisions should receive a construction that will render it harmonious with that purpose rather than one which will defeat it." Esteban v. Commonwealth, 266 Va. 605, 609, 587 S.E.2d 523, 526 (2003). "An undefined term must be 'given its ordinary meaning, given the context in which it is used.'" Sansom v. Bd. of Supervisors, 257 Va. 589, 594-95, 514 S.E.2d 345, 349 (1999) (quoting Dep't of Taxation v. Orange-Madison Coop. Farm Serv., 220 Va. 655, 658, 261 S.E.2d 532, 533-34 (1980)). The Court "must not add to the words of the statute, nor ignore its actual words." Robinson v. Commonwealth, 274 Va. 45, 51, 645 S.E.2d 470, 473 (2007). Although we strictly construe penal statutes against the Commonwealth, Gunn v. Commonwealth, 272 Va. 580, 587, 637 S.E.2d 324, 327 (2006), we keep in mind "that the plain, obvious, and rational meaning of a statute is always to be preferred to any curious, narrow, or strained construction." Turner v. Commonwealth, 226 Va. 456, 459, 309 S.E.2d 337, 338 (1983). Thus, "we will not apply 'an unreasonably restrictive interpretation of the statute' that would subvert the legislative intent

- 3 -

expressed therein." Armstrong v. Commonwealth, 263 Va. 573, 581, 562 S.E.2d 139, 144 (2002) (quoting Ansell v. Commonwealth, 219 Va. 759, 761, 250 S.E.2d 760, 761 (1979)).

We addressed the meaning of "dwelling house" in Code § 18.2-89 in Rash v. Commonwealth, 9 Va. App. 22, 383 S.E.2d 749 (1989). At the time the house there was broken into, it had been vacant for about seven months. Id. at 24, 383 S.E.2d at 750. The owners of the house inherited it from their sister. Id. Although the owners planned to sell it, it was fully furnished and one of the owners conducted routine maintenance. Id. In considering whether this represented a "dwelling house," the Court noted that "[b]urglary was, at common law, primarily an offense against the security of the habitation, and that is still the general conception of it."[1] Id. at 25, 383 S.E.2d at 751 (quoting Compton v. Commonwealth, 190 Va. 48, 55, 55 S.E.2d 446, 449 (1949)). The common law understood "dwelling house" "to mean any structure which human beings regularly used for sleeping." Id. The Court found that since other code sections concerned breaking and entering into structures not used for human dwelling, Code § 18.2-89 incorporated the common law notion of burglary. Id. at 26, 383 S.E.2d at 751. Thus, the Court held that "dwelling house" meant "a place which human beings regularly use for sleeping." Id. The Court then considered whether a residence meeting this definition could lose its legal status by the temporary absence of an occupant. Id. at 26-27, 383 S.E.2d at 751-52. After citing cases from a number of jurisdictions, the Court held that "a dwelling is no longer a 'dwelling house' for purposes of Code § 18.2-89 when its occupants leave without any intention to return."[2] Id. at

---

[1] As we stated in another case, "'common law burglary found its theoretical basis in the protection of man's right of habitation.'" Turner v. Commonwealth, 33 Va. App. 88, 92, 531 S.E.2d 619, 621 (2000) (quoting 2 Wayne R. LaFave, Substantive Criminal Law § 8.13(c) (1986)).

[2] See also Johnson v. Commonwealth, 18 Va. App. 441, 446-47, 444 S.E.2d 559, 562 (1994) (citing Rash for the notion "that Code § 18.2-89 is applicable to dwelling houses even though the occupants are temporarily absent at the time of the unlawful entry").

27, 383 S.E.2d at 752. On the facts of Rash, the Court found that since the house was unoccupied and would not have another occupant under the current owners, it did not represent a "dwelling house." Id. While the fact that the house was fully furnished could serve as evidence of intent to return, the Court held such a conclusion clearly rebutted by the evidence. Id.

The Court further elaborated on the meaning of a "dwelling house" in Hitt v. Commonwealth, 43 Va. App. 473, 598 S.E.2d 783 (2004). The issue directly presented was whether a bedroom within a house could qualify as a dwelling. Id. at 480, 598 S.E.2d at 786. In finding it could not, the Court stated that "while habitation or occupancy necessarily includes sleeping, it clearly also includes other 'dwelling-related' activities, such as preparing and consuming meals, bathing and other day-to-day activities traditionally associated with habitation." Id. at 483, 598 S.E.2d at 788.

Thus, Rash and Hitt provide two criteria for determining whether a residence constitutes a "dwelling house" under Code § 18.2-89. First, humans must regularly sleep there and engage in other functions related to habitation. Hitt, 43 Va. App. at 483, 598 S.E.2d at 788; Rash, 9 Va. App. at 26, 383 S.E.2d at 751. Second, if the regular occupants are away, they must intend to return. Hitt, 43 Va. App. at 482-83, 598 S.E.2d at 788; Rash, 9 Va. App. at 27, 383 S.E.2d at 752.

Yet neither Rash nor Hitt answer the question presented here. Namely, the issue is the extent to which a house must be "regularly use[d]" to qualify as a "dwelling house."

Since, as noted above, Virginia follows the common law definition of burglary, we first look to the common law for guidance. Our holding in Rash that a dwelling house remains legally a dwelling during the absence of its occupant if the occupant intends to return reflected a long line of common law precedent. Even from the sixteenth century it was held:

> If a man have two houses and inhabit sometimes in one,
> and sometimes in the other, if that house in which he doth not

- 5 -

> inhabit be broken in the night, to the intent to steal the goods then
> being in his house, then this is burglary, although no person be
> then in the house . . . . And in the same manner the house of every
> one is the proper place to preserve his goods, although no person
> be there: and that the law was always so, it is to be collected by the
> course of the statutes thereof made.

79 Eng. Rep. 1169 (K.B. 1593). Lord Hale commented on the issue in this way: "So if A. have two mansion houses, and is sometimes with his family at one and sometimes at the other, the breach of one of them in the absence of his family from thence is burglary."[3] 1 Sir Matthew Hale, The History of the Pleas of the Crown 556 (Philadelphia, Robert H. Small 1847). A nineteenth century American court later enunciated this principle by stating that "if one breaks into a dwelling-house in the night-time for a felonious purpose, though the owner and his family be temporarily absent, and no one be in it, it is burglary."[4] State v. Williams, 90 N.C. 724, 729 (1884).

While the common law permitted a person to maintain multiple dwelling houses, it still required more than only rare or infrequent use as a dwelling. In Brown's case, the court determined "that the fact of a servant having slept in a barn the night it was broken open and for

---

[3] See also People v. Guthrie, 193 Cal. Rptr. 54, 63 (Cal. Ct. App. 1983) (quoting Blackstone for the notion that a residence "wherein a man sometimes resides, and which the owner hath only left for a short season, *animo revertendi* (with the intent of returning), is the object to burglary, though no one be in it at the time of the fact committed").

[4] See also Scott v. State, 62 Miss. 781, 782 (1885) (remarking that "a dwelling-house does not lose its character as such by a mere temporary absence of its inhabitants who have left with intent to return"); Johnson v. State, 48 Ga. 116, 119 (1873) (holding that where a family lives in a dwelling house, "it is none the less their home . . . because temporarily absent therefrom"); State v. Reid, 20 Iowa 413, 418 (1866) (stating that at common law "it was not necessary that any person should be actually within the house at the time offense was committed"); State v. Meerchouse, 34 Mo. 344, 346 (1864) (observing that when a person leaves a house the house remains a dwelling as long as its occupant "quitted it *animo revertendi*"); Commonwealth v. Barney, 64 Mass. (10 Cush.) 478, 480 (1852) (calling a temporary absence "substantially a continued occupation"); State v. McGowan, 20 Conn. 245, 247 (1850) (stating that "[a] dwelling-house once inhabited . . . and from which the occupant is but temporarily absent" remains a dwelling).

several nights before, made no sort of difference in the question whether burglary or not."

2 Edward Hyde East, A Treatise on the Pleas of the Crown 497 (Philadelphia 1806).  Similarly, another case held that "a porter lying in a warehouse *to watch goods*, which is only for a particular purpose, does not make it a dwelling house."  Id.  Still, common law courts recognized that if a person often slept in a place, even if one not typically used for residency, that place represented a dwelling.[5]  Id.

The common law did not recognize a house maintained ready for occupancy as a dwelling where no person actually lived there.  Id. at 498.  In Hallard's case in 1796, a tenant moved out of a house and a new tenant prepared to arrive.  Id.  The new tenant placed all his furniture there and frequently visited the house, although he did not sleep there.  Id.  The court held the house was not a dwelling.[6]  Id.  In Rex v. Davis in 1800, a tenant left a house and sold his furniture to the owner.  Id. at 499.  The owner did not reside in the house, but had a servant sleep there for several weeks to guard the furniture until a new tenant arrived.  Id.  The court found no burglary could occur since no one resided in the house.  Id.

The common law was employed under facts analogous to this case in Gillum v. State, 468 So. 2d 856 (Miss. 1985).  A family there owned a vacation home they traveled to every two to three weekends.  Id. at 858.  They had owned the house for eight years.  Id.  They kept "clothing, furniture, food and other amenities of life" in it.  Id. at 859-60.  The court noted many

---

[5] See also State v. Jenkins, 50 N.C. 430, 432-33 (1858) (stating that a place of business may be a dwelling if "used *habitually, and usually,* by the owner, or his clerk, or servant, as a place for sleeping; but not by being used *occasionally, only,* for such a purpose"); Ex parte Vincent, 26 Ala. 145, 152 (1855) (citing Hale for the notion that "to break and enter a shop . . . in which the shop-keeper never lodges . . . is not burglary, but only larceny; but if he, or his servant, usually or often lodge in the house at night, it is then a mansion house in which burglary can be committed").

[6] See also State v. Potts, 75 N.C. 129, 131 (1876) (citing Hallard's case for the notion that "[i]t is clear that if no person sleeps in a house it is not burglary to break in it").

courts held a house used for temporary purposes could constitute a dwelling and cited the common law. Id. It then found that given "[t]he frequency and regularity of" trips to the house and "[t]he presence of clothing, furniture, food and other amenities of life," the house was a dwelling. Id.

Another case following the common law and with similar facts to this case is State v. Bair, 166 S.E. 369 (W. Va. 1932). The owners there used a house for vacation and weekend trips, and more often during the warmer seasons. Id. at 370. The house "was completely furnished for occupancy, such furnishing including beds and bedding, chairs, tables, radio, victrola, heating stove, dishes, cook stove and kitchen utensils. Food stuffs also were usually kept in supply." Id. After noting some of the principles of common law described above, the court found the house represented a dwelling. Id.

A court followed the common law in a different factual situation in State v. Celli, 263 N.W.2d 145 (S.D. 1978). In that case, two persons broke into an unoccupied cabin. Id. at 146. The cabin contained matches and dry macaroni, but had no running water or fuses and had mice in it. Id. at 146-47. The owners had not slept in the cabin for three to four years, although they occasionally used it during the day and their son and his wife sometimes slept there in the summer. Id. at 147. However, no one had stayed in the cabin for several months. Id. Based on the common law, the court found the cabin was not a dwelling house. Id. It found persuasive that "not only was the cabin usually unoccupied, but it was not ready for occupancy at the time defendants entered. . . . An unoccupied cabin with the electricity off and the bathroom facilities disconnected does not fall within our statutory definition." Id.

From this law and our own precedent, we discern the following principles regarding how a house must be "regularly used" to qualify as a dwelling under Code § 18.2-89. A person may have multiple dwelling houses. Each dwelling house must have humans sleep in it and engage in

other functions typically associated with habitation. The house must be maintained to make it suitable for immediate or rapid habitation.[7] Such maintenance includes the presence of power, water, food, furniture, beds, clothing, and other items normally associated with daily living. The list is not mandatory, exclusive, or exhaustive. Rather, such items are simply pieces of evidence for the finder of fact to consider in determining whether the prosecution has proven the presence of a dwelling house. Furthermore, a person must inhabit the house on a usual or periodic basis. Infrequent or very occasional use will not suffice. When the occupant is absent, he must intend to return to the house within a usual or periodic time. We do not establish a minimum amount of time a person must spend in the house. Each case will depend upon its particular facts. With a foundation in the common law, and reflecting the decisions of this Court and courts of other jurisdictions, we construe habitation sufficient to constitute a dwelling house under Code § 18.2-89 to include maintenance for reasonably prompt habitation, and at a minimum periodic habitation.

In this case, we conclude the Commonwealth presented sufficient evidence to show the house owned by Thornton was a dwelling. The house had furnishings in three bedrooms, a living room, family room, and kitchen. It had food in the refrigerator and pantry. The electricity and water worked. The house was maintained for immediate occupancy. The owner testified he stayed at the house approximately one weekend per month. We conclude that under these circumstances, the finder of fact could determine the house was a dwelling under the statute. We therefore affirm the circuit court.

Affirmed.

---

[7] We do not address in this opinion the question of whether renovations could lead to a dwelling losing its dwelling house status by rendering the building temporarily unsuitable for habitation. See Earnest v. State, 453 S.E.2d 818, 819 (Ga. Ct. App. 1995) (upholding a conviction where the owner lived in another place while the house underwent repairs).